IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

OREGON NATURAL RESOURCES          )
COUNCIL ACTION; OREGON            )
NATURAL RESOURCES COUNCIL         )
FUND; AMERICAN LANDS ALLIANCE;    )
BARK; CASCADIA WILDLANDS          )
PROJECT,                          )
                                  )   Civil No.  03-613-KI
            Plaintiffs,           )
                                  )
      vs.                         )   OPINION AND ORDER
                                  )
UNITED STATES FOREST SERVICE;     )
ANN VENEMAN, Secretary, U. S.     )
Department of Agriculture; RICHARD )
FERRARO, Deputy Regional Forester, )
U.S. Forest Service,              )
                                  )
            Defendants,           )
                                  )
      and                         )
                                  )
STARFIRE LUMBER CO.; ENGLE        )
INVESTORS, INC.; AMERICAN FOREST  )
RESOURCE COUNCIL,                 )
                                  )
   Amici Curiae/Defendants-Intervenors. )
                                  )

Peter M.K. Frost
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon  97401

      Attorney for Plaintiff

Owen L. Schmidt
U. S. Department of Agriculture
Office of the General Counsel
1220 S.W. Third Avenue
1734 Federal Building
Portland, Oregon  97202

Stephen J. Odell
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204-1024

Wells D. Burgess
U. S. Department of Justice
Environmental & Natural Resources Division
P. O. Box 663
Washington, D. C.  20044-0663

      Attorneys for Defendants

Julie A. Weis
Scott W. Horngren
Haglund Kirtley Kelley & Horngren, LLP
101 S.W. Main Street, Suite 1800
Portland, Oregon  97204

      Attorneys for Defendants-Intervenors

KING, Judge:

Plaintiffs Oregon Natural Resources Council Action, Oregon Natural Resources Council Fund, American Lands Alliance, BARK, and Cascadia Wildlands Project (collectively "ONRC") filed suit in May 2003, claiming that the Forest Service failed to comply with the National Environmental Policy Act ("NEPA") in offering and awarding six timber sales. I granted ONRC's motion for summary judgment in October 2003, Or. Natural Res. Council Action v. United States Forest Serv., 293 F. Supp. 2d 1200, 1210 (D. Or. 2003), and enjoined further logging "pending a decision by the agency whether to propose to resume any such activities." Opinion and Order of November 21, 2003. On remand from the injunction, the Forest Service has undertaken additional analysis of the environmental impacts of these timber sales.

Before the court are several motions related to the sufficiency of that analysis. The Forest Service has filed a motion to lift the stay and dissolve the injunction, and has also filed a motion for summary judgment. ONRC has filed a motion for summary judgment. Amici Curiae/Defendants-Intervenors Starfire Lumber Co., Engle Investors, Inc., and American Forest Resource Council ("Intervenors") have filed a motion regarding remedy issues. For the following reasons, I grant in part ONRC's motion for summary judgment (# 283), deny the Forest Service's motions for summary judgment (# 280) and to lift the stay and dissolve the injunction (# 278), and deny Intervenor's motion regarding remedy issues (# 275).

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In 1997 and 1998 the Forest Service prepared five Environmental Assessments ("EAs") for the six timber sales in the Mt. Hood and Willamette National Forests at issue in this case.[1] The agency concluded that the proposed logging would have no significant impact on the environment, and issued a finding of no significant impact ("FONSI") for each sale, which relieved the agency from having to prepare an Environmental Impact Statement ("EIS").  40 C.F.R. § 1508.13.  The Forest Service issued contracts for one of these sales in 1998, for four other sales in 2002, and for the sixth in March 2003.  Other details regarding these proposed sales are included in my October 2003 opinion.  Or. Natural Res. Council Action, 293 F. Supp. 2d at 1201-04.  Between the time the Forest Service prepared the EAs in 1997 and 1998 and this court's injunction in November 2003, the agency did not prepare new or supplemental NEPA analyses to consider, analyze or disclose its duties under the survey and manage standard, the results of the surveys, any changes made to the proposed sales, or any other changes in environmental conditions.

Plaintiffs filed suit on May 9, 2003, alleging that the Forest Service did not comply with NEPA when it decided to offer, award, or otherwise proceed to allow logging of the six timber sales.  I granted summary judgment on the plaintiffs' first claim in its Amended Complaint, that the Forest Service violated NEPA by failing to consider the agency's survey and manage duties, results of surveys, or management decisions based on the surveys.  Id. at 1205-10.

The November 21, 2003 injunction ordered, in relevant part, that:

---

[1] The Straw Devil EA covers both the Straw Devil and East Devil timber sales.

1.      The Forest Service shall not approve, authorize, or allow any further logging or other ground-disturbing activities on any of the six timber sales subject to this court's October 9, 2003, Opinion in this case, pending a decision by the agency whether to propose to resume any such activities.  ...

2.      If the Forest Service decides that it wishes to propose to proceed with any logging or ground-disturbing activities on any of the six timber sales, it shall first comply with NEPA by preparing Environmental Assessments, Supplemental Environmental Assessments or Environmental Impact Statements that consider, analyze and disclose the impacts of any logging or other ground-disturbing activities.  The Forest Service shall analyze the effects of the Borg and East Devil timber sales on the Canada lynx.

...

4.      The injunction on any further logging or ground-disturbing activities shall continue until such time as the court has resolved any objections and determined that the Forest Service has complied with NEPA.  ...

Opinion and Order of November 21, 2003, at 6-7.

The order specifically forbade the Forest Service from circulating its already-prepared Supplemental Information Reports ("SIRs") as Supplemental Environmental Assessments ("SEAs") but otherwise did not specify the form which the agency's further analysis should take. I also expressed the expectation that the Forest Service's NEPA analyses would disclose and analyze the survey and manage duties, discuss the survey methodologies and results, present a range of alternatives and explanations for its decisions, and otherwise comply with NEPA.

The Forest Service issued five draft SEAs for the timber sales in February 2004. Plaintiffs and other members of the public then commented on the draft SEAs.  Among the comments was that the Forest Service failed to disclose relevant and contemporary data and information in either its original EAs or draft SEAs regarding the northern spotted owl, changes

in the affected environment of the sales including recent wildfires, and other issues related to the proposed logging.

In April 2004, the Forest Service filed final SEAs. In the Response to Comments that accompanied the SEAs, the agency took the position that the scope of the draft SEAs was set to specifically remedy the deficiencies found by the court. The Forest Service asserted that any consideration of species other than survey and manage species was outside the scope of the draft SEAs, that alternatives not based on survey and manage duties were also outside of the scope of the draft SEAs, and that the public had already had a chance to influence the basic go/no-go decision. Response to Comments on Draft Supplemental Environmental Assessments, April 16, 2004, at 2-4 ("Response to Comments"). The SEAs modified the timber sales by reducing the acreage the Forest Service would allow to be logged. See, e.g., Clark SEA at 12 (reducing proposed old-growth logging by 65 acres from the 274 acres approved in the EA); Straw Devil SEA at 16, AR at 897 (removing 85 acres from the 364 acres of old-growth approved for logging in the EA).

On July 8, 2004, ONRC filed a motion for leave to file a Third Amended Complaint and filed a motion for summary judgment. In a conference with the parties on July 27, 2004, I granted ONRC leave to file their Third Amended Complaint, except for their proposed Count One. I also clarified for the Forest Service that the remand was not as narrow in scope as it appeared to believe in light of the limited information it included in the SEAs. On August 4, 2004, the Forest Service moved for a stay and further remand to consider various additional specific items raised during the public comment process that were not directly related to the

survey and manage issues. On April 11, 2006, after filing thirteen status reports over the course

of eighteen months, the Forest Service filed a document with the court entitled "Review &

Analysis of Remainder of Comments on EA Supplements for Multiple Timber Sales on Mt.

Hood & Willamette National Forests on Remand in <u>ONRCA v. Forest Service</u>, CV-03-613-KI

(D. Or.)" ("Review & Analysis").

       In the 2006 Review & Analysis, the Forest Service took the position that it had no legal

obligation to prepare any further supplementation to its EAs beyond the SEAs, based on two

findings: first, that there was no longer an "ongoing major federal action" because the previously-

issued timber sale contracts constrained the agency's authority, and second, that none of the

information contained or referenced in the comments represented significant new information

bearing on the timber sales. The Forest Service reiterated its position that "our potential

'decision space' in this context is quite narrow, and is effectively limited to potential

modifications that would be authorized by the applicable timber sale contracts and/or that relate

to the purpose of our preparing the EA supplements," which, in its view, "was to evaluate and

determine what steps to take, if any, after considering the new Survey & Manage species and

lynx information." Review & Analysis at 4.

       The Forest Service also noted in the Review & Analysis that, although it understood the

court to have clarified that the agency's initial scope in preparing the SEAs was too narrow, the

agency retained considerable discretion to define the purpose and needs of SEAs. The agency

claimed that it exercised this discretion "in terms of addressing the NEPA violations the Court

found in the original EAs" in the SEAs. <u>Id</u>. That is, the Forest Service chose not to change the

2004 SEAs in any way.  Instead, the agency used the balance of the Review & Analysis to

respond to comments that it had not addressed in finalizing the SEAs because it originally

asserted that the comments were beyond the scope of the SEAs.  The purpose of this analysis was

to determine whether any of the comments triggered the standard for additional supplementation

of the EAs.  The Forest Service concluded that none of the information contained or referenced

in the comments to the draft SEAs represented significant new information regarding the

environmental effects of the timber sales that had not already been addressed in the original EAs

or in the SEAs.  Id. at 1.

### DISCUSSION

I.    Legal Standards

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health Servs.,

Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

The plaintiffs' action arises under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701 et seq..  The scope of the court's review under the APA is limited: it may set aside the

government's action only if, based on the administrative record, the Forest Service's decision to

proceed with the timber sales based on its EAs and SEAs, or its decision not to supplement the EAs further, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... [or] without observance of the procedure required by law." 5 U.S.C. § 706(2)(A) & (D). A court must set aside agency action taken without observance of the procedure required by law. Idaho Sporting Congress Inc. v. Alexander, 222 F.3d 562, 567 (9th Cir. 2000).

Under NEPA, federal agencies must prepare an EIS for proposed "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). For projects such as the proposed logging in this case, an agency may prepare an EA to determine whether an EIS is necessary. 40 C.F.R. § 1501.4(a)-(c). If the EA results in a finding of no significant impact, no EIS is required. Id. §§1501.4(c)-(e), 1508.13.

NEPA requires that agencies take a "hard look" at environmental consequences and prepare up-front, coherent, comprehensive environmental analyses. Ctr. for Biological Diversity v. United States Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003). Environmental review documents must be prepared as early as possible in the decisionmaking process because NEPA procedures are meant to "ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Churchill County v. Norton, 276 F.3d 1060, 1072-73 (9th Cir. 2001). The proper timing of environmental review is one of NEPA's central themes. Save the Yaak Committee v. Block, 840 F.2d 714, 718 (9th Cir. 1988). Any environmental assessment must be "prepared early enough so it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5; Idaho Sporting Congress v. Alexander, 222 F.3d at 567-68. The phrase "early enough" means "at the earliest possible time

Page 9 - OPINION AND ORDER

to ensure that planning and decisions reflect environmental values." Andrus v. Sierra Club, 442 U.S. 347, 351 (1979).

Once an agency has prepared an EA and issued a FONSI, an agency must supplement its analysis if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th Cir. 1998) (holding that an EA must be supplemented in the same manner as an EIS). There is an obligation to supplement an EA if there remains major federal action to occur and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989).[2]

II.    Scope of Additional Environmental Assessment After November 2003 Injuction

Two preliminary issues arise from the Forest Service's position in its Review & Analysis, and in this litigation, that the contracts for logging the six timber sales limited the agency's discretion to assess environmental conditions on these lands. First, the Forest Service argues that, when it prepared the SEAs and evaluated new information, the legal rights of the contract purchasers constrained the agency to a narrow decision space, limited to potential modifications to the logging contracts. Review & Analysis at 3-4. In arguing that the contracts limited the scope of the environmental analysis that was possible on remand, the Forest Service is in effect

---

[2]NEPA regulations define "significantly" as requiring consideration of both context and intensity. 40 C.F.R. § 1508.27; see Marsh, 490 U.S. at 374 n.20. Context refers to the setting of the proposed action, while intensity refers to the severity of impact. 40 C.F.R. § 1508.27(a)-(b). The regulations list ten factors to be considered when evaluating intensity. Id. § 1508.27(b)(1)-(10).

claiming that it could not reconsider its original decisions to award the contracts, notwithstanding that it had made those decisions based on deficient EAs.

Second, the Forest Service argues that there is no "ongoing major federal action" triggering the duty to supplement the NEPA analyses the agency has already prepared, "given the constraints on our authority to modify the contracts for the timber sales." Id. at 1.  The agency concluded that it had no legal obligation to prepare any further supplementation of the EAs. Nevertheless, out of an abundance of caution, the Forest Service did address the comments submitted on the draft SEAs to which it did not respond two years earlier, to determine whether any comments gave rise to an independent need for a supplemental NEPA analysis.  Id. at 4.

The Forest Service advances both arguments to support the basic point that the agency has done all the environmental analysis required to now lift the injunction and allow the logging to proceed.  The agency is wrong as a matter of law on both arguments, and these errors infected the agency's analysis in both the SEAs and the Review & Analysis.

A.    Effect of Timber Sale Contracts on Scope of Forest Service's NEPA Duties

The Forest Service prepared its supplemental environmental analysis starting from the premise that it has already awarded contracts for the harvest of the six timber sales, and that the purchasers of those contracts have existing legal rights to harvest the timber sales subject to certain limited authority in the agency to modify or terminate the contracts in defined circumstances.  Review & Analysis at 3.  Combined with the agency's determination that the only proposed federal action before it during the preparation of the EA supplements was whether to modify the timber sales, if at all, in light of its survey and manage duties, the agency conceived of its decision space as quite narrow.

Page 11 - OPINION AND ORDER

I do not read the contracts or the relevant case law and regulations to impose such constraints on the Forest Service.  For example, the Borg Timber Sale contract specifies that the Forest Service may terminate the contract upon a determination that "continuation of all or part of this contract would ... [c]ause serious environmental degradation or resource damage."  Borg Timber Sale Contract ¶ BT8.24.  This clause derives from the Forest Service regulation which provides that timber sale contracts may be cancelled upon a determination "that operations thereunder would result in serious environmental degradation or resource damage."  36 C.F.R. § 223.116(a)(5); see also City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990) (acknowledging Forest Service's authority to cancel timber contracts).  The contract and regulations provide for reasonable compensation to the private party for cancellation in these circumstances.  Tenakee Springs, 915 F.2d at 1312; 36 C.F.R. § 223.116(a)(5); Borg Timber Sale Contract ¶ BT8.24.  The contract and regulations also allow for modification of timber contracts, with compensation, to prevent environmental damage.  Tenakee Springs, 915 F.2d at 1312; 36 C.F.R. § 223.113; Borg Timber Sale Contract ¶ BT8.3(a)(i).  In this case, the Forest Service has already modified the contracts by reducing the acreage available for logging through the 2004 SEAs.  See, e.g., Clark SEA at 12; Straw Devil SEA at 16, AR at 897.  There is no principled difference between the authority the Forest Service actually exercised to modify the existing contracts and the authority it had, and retains, to terminate the contracts.

It is understandable that the Forest Service might not wish to trigger the compensation provisions.  However, in this case, the agency decided to award the contracts based on an inadequate consideration of the environmental impacts of the project, including duties related to survey and manage species which existed at the time it made the decisions, but which it did not

consider.  Or. Natural Res. Council Action, 293 F. Supp. 2d at 1207-09.  On remand, the agency

was wrong to assume that the contracts in any way limited its obligation to thoroughly analyze

the environmental effects of the six timber sales under NEPA.  Even after awarding the timber

sale contracts, the Forest Service had the obligation to comply fully with NEPA, including,

potentially, uncovering new information and objectively considering in the course of the remand

whether the contract "would cause serious environmental degradation," requiring its termination.

The Ninth Circuit has made it clear that an agency may not limit its obligations to prepare

an environmental assessment that complies with NEPA by entering into a contract.  In Metcalf v.

Daley, the federal defendants signed a contract with the Makah Indian Tribe, agreeing to make a

formal proposal urging the International Whaling Commission to allow the tribe to engage in

limited whaling.  214 F.3d 1135, 1139 (9th Cir. 2000).  The next year, the defendants completed

an EA which found that the whaling proposal would not significantly affect the environment.  Id.

at 1140.  Pointing out that NEPA's effectiveness depends entirely on involving environmental

considerations in the initial decisionmaking process, the Ninth Circuit concluded that the agency

had prepared the EA too late, after it had already committed itself contractually to the proposal it

was analyzing.  Despite the existence of the government contract with the tribe, the Ninth Circuit

ordered the agency to prepare a new EA under circumstances that ensured an objective

evaluation, free of the previous taint.  Id. at 1146.

In Save the Yaak, the Forest Service entered into road reconstruction contracts before

EAs were prepared, and construction had begun by the time the agency prepared Biological

Assessments ("BAs") which, the agency argued, reasonably supported the finding of no

significant impact.  840 F.2d at 716-18.  Concluding that the untimely preparation of the EAs and

Page 13 - OPINION AND ORDER

BAs meant that the Forest Service failed to take a "hard look" at the environmental consequences of its actions, the Ninth Circuit enjoined the road reconstruction and related timber sales and remanded the case to the agency for further analysis - despite the existence and partial execution of the existing contracts.  Id. at 722.  In this case, the Forest Service was incorrect to premise its consideration of environmental effects in its SEAs and Review & Analysis on any constraints due to the existing timber contracts.

    B.    Remaining Agency Action

    ONRC's suit from its inception has involved a challenge to the Forest Service's decisions to issue the timber sales contracts under the APA.  While ONRC's arguments in the Third Amended Complaint all relate to whether the Forest Service has adequately complied with NEPA in making those decisions, the Forest Service's decisions to award the logging contracts were the "agency action" that this court set aside in granting judgment for ONRC and issuing the November 2003 injunction.   The APA requires a court to set aside agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D); see Sierra Club v. Martin, 168 F.3d 1, 5 (11th Cir. 1999) (setting aside as arbitrary and capricious a Forest Service decision to approve timber sales without gathering population data required by forest plan); Or. Natural Res. Council Action v. United States Forest Serv., 59 F. Supp. 2d 1085, 1092-94 (W.D. Wash. 1999) (setting aside approval of nine timber sales for failure to undertake survey and manage duties). The effect of the 2003 judgment for ONRC and the subsequent injunction was to set aside the decisions to award the timber sale contracts and remand for the Forest Service to comply with NEPA before deciding whether to propose to proceed with logging of those sales, and to enjoin logging until the court determined that the Forest Service complied with NEPA.

Page 14 - OPINION AND ORDER

Although the Forest Service has taken a different position in its most recent briefing, the agency recognized in the remand after the November 2003 injunction that it had further action to take, based on the finding that the original EAs were deficient and this court's order that the agency prepare a new environmental analysis if it wished to proceed with the six timber sales. The Forest Service's response was that "[t]he course chosen by the agency is to proceed with the timber sales after preparing Supplemental EAs, assuming the [draft SEAs] support a finding that the information learned pursuant to survey and manage duties is 'not significant.'"  Response to Comments at 1.  The agency recognized that if the SEAs were ultimately judged not to be adequate, or that the impacts to the human environment are in fact significant, and the NEPA process was again remanded to the agency, "the agency will then decide once again which course of action to pursue," with options including voiding the timber sale contracts or preparing an EIS. Id.  Having stated its intention to proceed with the timber sales only if the SEAs supported a finding of no significant impact, or to make an alternative decision if the impacts were found not to be significant or the SEAs ultimately adjudged to be inadequate, and having voluntarily requested a remand in August 2004 to conduct further environmental review, the agency is now estopped from arguing that it had no further action to take on these timber sales.  Kern v. BLM, 284 F.3d 1062, 1069 (9th Cir. 2002).

Nevertheless, the Forest Service now argues that there is no "ongoing major federal action" remaining that would require supplementation of the EA, relying on Cold Mountain v. Garber, 375 F.3d 884, 894 (9th Cir. 2004).  The court in Cold Mountain found that the NEPA analysis of the issuance of a 10-year permit for bison capture facility was adequate, and that,

because the permit had been issued earlier, there was no "ongoing" federal action requiring supplementation.

The Supreme Court's decision in <u>Marsh</u> contemplates that there must be federal action <u>remaining</u> to occur, not necessarily "ongoing." 490 U.S. at 374. <u>Marsh</u> did not narrow the circumstances when supplementation is required as much as the Forest Service suggests when it lifts the term "ongoing" from <u>Cold Mountain</u> in the Review & Analysis and in its briefs. The Court in <u>Marsh</u> specified that if "there remains 'major Federal actio[n]' left to occur," supplemental NEPA analysis is required if new information is significant. <u>Id</u>. The cases the government cites for the proposition that there is no "ongoing major federal action" requiring supplemental NEPA in this case all involved past federal actions that had been taken and completed pursuant to an adequate or unchallenged NEPA process. <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 73 (2004) ("<u>SUWA</u>"); <u>Cold Mountain</u>, 375 F.3d at 894; <u>Wyoming v. United States Dep't of Interior</u>, 360 F. Supp. 2d 1214, 1219, 1238 (D. Wyo. 2005); <u>Envtl. Prot. Info. Ctr. v. United States Fish & Wildlife Serv.</u>, No. C 04-04647, 2005 WL 3021939, at *6 (N.D. Cal. Nov. 10, 2005).

In this case, the Forest Service's actions in deciding to award the timber sale contracts were set aside because the agency did not comply with NEPA in preparing the EAs on which those sales were based. In similar cases where the agency's decision has been set aside because its NEPA analysis was inadequate, and logging enjoined until the Forest Service had complied with NEPA, courts have implicitly recognized that there remains major federal action to occur until the agency properly complies with NEPA. <u>See, e.g.</u>, <u>Idaho Sporting Congress v. Alexander</u>, 222 F.3d at 568-69 (requiring district court to enjoin further logging because the EAs and EISs

Page 16 - OPINION AND ORDER

did not include information and analysis which the Forest Service was obliged to consider under

a prior Ninth Circuit decision); <u>Friends of the Clearwater v. Dombeck</u>, 222 F.3d 552, 554-55,

558-59 (9th Cir. 2000) (requiring review of new information for possible supplementation of

environmental analyses, where an agency had produced an inadequate environmental assessment

and issued timber sale contracts based on the flawed assessment).  Because the agency's original

decisions to award the contracts were set aside, and the logging of the six timber sales placed

under a permanent injunction, there remains major federal action to occur until the Forest Service

has made a fully-informed decision, in compliance with NEPA, that it should proceed with the

logging of these six sales.

II.    <u>Adequacy of Environmental Assessments as Supplemented</u>

      The parties' cross motions for summary judgment are based on Counts Two through Six

of ONRC's Third Amended Complaint.[3]  In Count Two, ONRC argues that the EAs and SEAs,

considered together, are not in compliance with NEPA because they lack high quality

information and accurate scientific data related to the Northern Spotted Owl and to current

environmental conditions on the six sales.  The plaintiffs contend that the Forest Service has not

included sufficient information in its NEPA documents regarding the current conditions on these

sales to satisfy its obligation to take a hard look at the contemporary effect of the proposed

logging.  ONRC argues that the EAs, which were issued in 1997 and 1998, and the 2004 SEAs,

---

[3]ONRC was not given leave to amend to add Count One of its Third Amended
Complaint.  Count Six is a stand-alone claim based on alleged violations of the APA.  However,
the APA relates to the court's authority and standard of review of agency actions, and does not
give rise to a cause of action absent some other statutory or regulatory duty, such as the NEPA
obligations cited in Counts Two through Five.  <u>Or. Natural Res. Council v. Thomas</u>, 92 F.3d 792,
798-99 (9th Cir. 1996).

which discussed only the Forest Service's survey and manage duties related to these six timber sales, do not collectively account for nearly a decade of changed conditions on these six sales.

ONRC's argument sweeps too broadly. The plaintiffs couch their arguments in the alternative, noting that the information and data which it deems insufficient in Count Two of their Third Amended Complaint is also new information requiring supplementation under Count Three. Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 28. Under Ninth Circuit precedent, once an agency has issued an EA, the agency is not required to disclose every piece of new information in a formal NEPA document for public comment, but may use more informal analysis to determine whether the new information reaches the significance threshold. Idaho Sporting Congress v. Alexander, 222 F.3d at 566-67 & 567 n.3; Friends of the Clearwater, 222 F.3d at 559-60. Unlike the survey and manage duties which resulted in the first remand in this case, ONRC does not contend that the information it presented as comments during the SEA development process in 2004, or other new information it cites in its court filings, was information available to the Forest Service at the time the initial EAs were prepared in 1997-98. Instead, the information, including forest fires subsequent to the EAs and data on the contemporary condition of the Northern Spotted Owl, is quintessentially "new information" which the agency, in the first instance, may review for significance to determine whether a SEA, a new EA, or an EIS is required. The majority of ONRC's arguments are properly addressed under its alternative claim that the Forest Service failed properly to supplement its EAs and SEAs based on this new information.

However, the record before the court shows that the Forest Service's SEAs were procedurally flawed in one significant respect. ONRC argues that the Forest Service refused in

Page 18 - OPINION AND ORDER

the SEAs to consider a true no action alternative.  I agree.  Informed and meaningful

consideration of alternatives, including a no-action alternative, is central to the NEPA statutory

scheme.  Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 729 (9th Cir.

1995).  Consideration of alternatives must include whether a project should be totally abandoned.

Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988).  Because the Forest Service

had an obligation to supplement its original EAs and the agency still had to decide whether to

proceed with the timber sales after preparing the SEAs, compliance with NEPA dictated that the

agency thoroughly consider alternatives in light of the combined effects on survey and manage

species together with other environmental impacts the agency has identified.

The Forest Service in its SEAs considered two alternatives for each of the timber sales,

focused on ways that the survey and manage duties could be carried out with the minimum

impact to the existing sale contracts.  For example, on the Clark Timber Sale, the agency

considered an alternative that would locate red vole habitat areas that would least impact the

timber sale contract, and another that would maximize protection of confirmed nest trees by,

where feasible, buffering sites from logging.  Clark SEA at 6-13.  In choosing the first

alternative, the Forest Service reduced the proposed logging by approximately 65 acres from the

274 acres of old-growth approved for logging in the EA.  Id. at 12.  The Straw Devil SEA

removed 85 acres from the 364 acres of old-growth proposed for logging in the EA.  Straw Devil

SEA at 16; AR at 897.  The agency insists that it did not have to consider no-action alternatives

in the course of the SEA because it considered, and rejected, no-action alternatives for each of

the timber sales in the original EAs.

Page 19 - OPINION AND ORDER

When an agency's initial analysis of alternatives involves a major deficiency, like the Forest Service's failure here to consider its duties under the survey and manage standards, the agency's decision was necessarily undertaken without a proper consideration of relevant alternatives. Its consideration of the no action alternatives in the original EAs was uninformed by the substantial duties under the survey and manage standards, duties that ultimately led the agency to reduce the acreage that it now proposes may be logged by up to 25% on some sales. The Forest Service nowhere has analyzed whether the impacts on the survey and manage species, when considered in conjunction with other identified environmental effects which it found not to be significant in the original EAs, warrant the complete abandonment of this project. Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 997 (9th Cir. 2004) (holding EAs inadequate where they failed to consider how individual impacts might combine or synergistically interact with each other to affect the environment); Bob Marshall Alliance, 852 F.2d at 1228.

NEPA obliges an agency to revisit its alternatives analysis, including a true no action alternative, whenever there are changed circumstances that affect the factors relevant to the development and evaluation of alternatives. Natural Res. Def. Council v. United States Forest Serv., 421 F.3d 797, 809, 813-14 (9th Cir 2005) (remanding for a fresh consideration of alternatives because the Forest Service used inaccurate data for market demand in developing its original NEPA analysis, rendering that alternatives consideration inadequate because it was impossible to tell what other alternatives the agency might have considered based on accurate information); Alaska Wilderness, 67 F.3d at 730-31 (holding that the elimination of the contract on which the original environmental analysis was based affected the range of alternatives the agency might consider). The substantial reductions in acreage proposed for logging in some of

the SEAs indicates that the "significance" of survey and manage duties (and thus the obligation

to prepare an EIS) must have been a close question for the agency, and accordingly represents the

sort of changed legal or factual circumstance that warrants a reexamination of the no action

alternative and other alternatives for proceeding with these logging projects.

Because the Forest Service misconceived the scope of its duties in preparing the SEAs,

and wrongly believed itself limited to proposing alterations to the areas proposed for logging

under the timber sale contracts, the agency did not satisfy its obligation to consider a true no

action alternative before deciding to allow the sales to proceed.  On remand, the Forest Service

must supplement its SEAs to consider a full range of alternatives in light of the survey and

manage duties and other environmental impacts from the proposed logging, including objectively

considering the alternative of abandoning these projects.  Klamath-Siskiyou Wildlands, 387 F.3d

at 997; Metcalf, 214 F.3d at 1142; Bob Marshall Alliance, 852 F.2d at 1228.  Fresh consideration

of a no action alternative in this case is consistent with the agency's obligation to take a

meaningful look at the environmental consequences of the proposed action at a point early

enough to contribute to the decisionmaking process, and not simply "rationalize or justify

decisions already made."  40 C.F.R. § 1502.5; Ctr. for Biological Diversity, 349 F.3d at 1166.

III.    Forest Service's Duty to Further Supplement Environmental Assessments

In the Third Count of its Third Amended Complaint, ONRC argues that the Forest

Service has failed properly to supplement its EA as NEPA requires.  Once an agency has

prepared an EA or an EIS, the agency has discretion in what form it chooses to determine

whether new information regarding environmental impacts of its proposed projects is significant

and thus requires supplementation of the original environmental analysis.  Idaho Sporting

Congress v. Alexander, 222 F.3d at 566; Friends of the Clearwater, 222 F.3d at 559-60.  The
2003 injunction in this case required that the Forest Service analyze its survey and manage duties
through a NEPA document such as an EIS, EA, or SEA, because those legal requirements were
not "new" information at the time the agency prepared the original EAs.  Or. Natural Res.
Council Action, 293 F. Supp. 2d at 1208-09.  As discussed above, the decision not to consider
the effects on survey and manage species in conjunction with other environmental impacts from
the proposed logging and undertake a proper alternatives analysis in the SEAs also must be
rectified in a formal NEPA document.  In contrast, the Forest Service was entitled to use the
Review & Analysis to consider whether new information that has arisen since the preparation of
the EAs in 1997 and 1998, and the SEAs in 2004, was significant.

   In reviewing new information to decide whether to supplement its EAs, the Forest
Service must take a hard look and carefully consider the information, evaluate its impact, and
support its decision not to supplement with a statement of explanation.  Price Road
Neighborhood Ass'n v. United States Dep't of Trans., 113 F.3d 1505, 1510 (9th Cir. 1997) (citing
Animal Def. Council v. Hodel, 840 F.2d 1432, 1439 (9th Cir. 1988), modified 867 F.2d 1244 (9th
Cir. 1989)).  A court will uphold a decision not to supplement an environmental analysis if the
decision is reasonable.  Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1463 (9th Cir. 1984).
Reasonableness depends on the environmental significance of the new information, the probable
accuracy of the information, the degree of care with which the agency considered the new
information and evaluated its impact, and the degree to which the agency supported its decision
not to supplement with a statement of explanation or additional data.  Id. at 1463-64.  The focus
is on the quality of the agency's decisionmaking process, not its outcome.  Friends of the

Clearwater, 222 F.3d at 560 (an agency must "articulate a rational connection between the facts it has found and its conclusions" when assessing whether to supplement an EA); Animal Def. Council, 840 F.2d at 1439 (upholding agency decision not to supplement an EIS where the agency "carefully considered the information, evaluated its impact, and supported its decision not to supplement with a statement of information").

ONRC argues that the Forest Service has not included high quality information in its NEPA documents regarding the contemporary effects of the proposed logging on the Northern Spotted Owl. ONRC argues that all of the contemporary information must be disclosed in NEPA documents for public review. In its briefing, the Forest Service makes several arguments that the current impacts of this proposed logging on the Northern Spotted Owl is insignificant, and that it is not obligated to disclose the information in a supplemental NEPA document. I agree with the Forest Service that any contemporary information regarding the impact of the six timber sales on the Northern Spotted Owl may be analyzed initially for significance without preparing a supplemental EA. However, after reviewing the record and the Review & Analysis, I conclude that the Forest Service has not exercised sufficient care in assessing whether contemporary information about the Northern Spotted Owl is "significant" and whether supplemental analysis of these six timber sales under NEPA is required on that basis.

The Forest Service and Intervenors argue that the documents in the administrative record support a finding that the effects of the logging on the owls will not be significant. For example, they argue that the September 2005 Northwest Forest Plan status report on the Northern Spotted Owl, included in the administrative record at AR 1580-1767, supports the conclusion that supplementation is not required. They also argue that other documents in the record, including

Page 23 - OPINION AND ORDER

the September 2004 Scientific Evaluation of the Status of the Northern Spotted Owl, AR 1880-2387, already address the information ONRC argues is "new."  However, including documents in the administrative record, without analyzing them in the context of their bearing on the proposed action, does not satisfy the requirement that the agency make a reasoned decision based on its evaluation of the significance or lack of significance of the new information.  Ctr. for Biological Diversity, 349 F.3d at 1169 (holding that inclusion of documents in administrative record did not cure deficiencies in EIS); Headwaters v. BLM, 914 F.2d 1174, 1177 (9th Cir. 1990) (noting that agency has obligation to make a reasoned decision in evaluating the need to supplement, citing Marsh, 490 U.S. at 378).

The Forest Service's SEAs and Review and Analysis include almost no explanation for why the various items of new information about the owl do not constitute significant new information bearing on the six timber sales.  In the 2004 SEAs, the Forest Service refused to consider any new information at all regarding species other than the survey and manage species.  Response to Comments at 2.  ONRC submitted a comment to the draft SEAs that contemporary studies showed that the rate of decline of the Northern Spotted Owl was estimated at 4% or as high as 7%.  In the Review & Analysis, the Forest Service first responds that this comment is outside the scope of the EA supplements, and then that the comment does not present any significant new information because further declines in spotted owl habitat outside of late successional reserves were expressly anticipated when the Northwest Forest Plan was prepared in 1994.  Review & Analysis at 18.  The Forest Service's analysis of new information about the accelerating decline of the species is essentially limited to a single sentence, which references the finding in the 2005 Biological Opinion for the Willamette National Forest that logging will not

Page 24 - OPINION AND ORDER

jeopardize the continued existence of the Northern Spotted Owl or result in adverse modification to its critical habitat.  Id. at 11, 17-18.  That Biological Opinion covers the Clark and Pryor sales and did not consider effects on the Northern Spotted Owl from the Straw Devil sale.  AR 1326.

The Forest Service's analysis of the significance of new information does not mention the September 2005 status report or the September 2004 Scientific Evaluation.  The Review & Analysis does not address the potential significance for these timber sales of the finding that Northern Spotted Owl populations in Oregon are declining at a rate that is more than twice that estimated when the original EAs were prepared.  Status and Trends in Demography of Northern Spotted Owls Scientific Evaluation, 1985-2003, AR 2394.  Nor does it expressly evaluate new threats to Northern Spotted Owls from barred owls or the West Nile virus, nor consider the June 2004 opinion of one of the federal managers who prepared the Northwest Forest Plan that current uncertainties regarding the decline of the Northern Spotted Owl warrant more attention to protecting suitable habitat, and not only critical habitat.  P's Reply Brief at 10; see also Review & Analysis at 34 (mentioning the general concern about barred owls at the time the original EAs were prepared, but without reference to more recent information that the barred owl is a greater threat to the Northern Spotted Owl than at the time the latter was listed as threatened, AR 1336).  There is no documentation in the record of more recent assessment of effects on the owls from the Borg and Solo timber sales in the Mt. Hood National Forest, only an assertion that unspecified recent owl reports would not change any of the analysis prepared concerning impacts of these sales on the owls - without explaining why.  Review & Analysis at 34.  In light of the long time since the EAs were prepared, and the large amount of recent documentation about the owls included in the administrative record, the agency has not provided a sufficiently careful and

Page 25 - OPINION AND ORDER

thorough explanation of whether or not this new information justifies a supplemental environmental analysis.

This contrasts to another case in which the Ninth Circuit upheld a Forest Service EA which carefully considered the effects of proposed logging on the Northern Spotted Owl.  In Environmental Protection Information Center v. United States Forest Service, the Ninth Circuit affirmed an agency decision not to prepare an EIS based on the effects of a timber sale in the Klamath National Forest on the owls.  451 F.3d 1005, 1018 (9th Cir. 2006) ("EPIC").  The general standard for whether the EA in that case was sufficient, or whether the more informal supplementation determination in this case is sufficient, is the same: the record must show that the agency has taken a hard look at the question and made a reasonable decision.  Id. at 1009; Price Road, 113 F.3d at 1510.  In EPIC, the Forest Service not only disclosed new information in the EA, but it also thoroughly analyzed that information for significance.  EPIC, 451 F.3d at 1012-16; see also id. at 1018 (praising the Forest Service's "thorough and candid environmental analysis" and "detailed and adequate consideration of information from a wide range of sources").  Although the agency in this case included some similar information in the administrative record, its analysis of the significance of that information is far from thorough.

The additional information about the condition of the Northern Spotted Owl since the agency prepared the EAs eight years ago justifies taking another hard look at whether any logging of suitable owl habitat is a significant environmental impact warranting supplemental analysis.  Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1025 (9th Cir. 1980) (holding that a decision not to supplement was unreasonable where a new study that raised substantial concerns about the effects of a particular fault on the proposed dam that might

undermine the premises of the original environmental analysis).  Additional documentation or

data in the record does not cure the unreasonableness of the Forest Service's Review & Analysis

on this issue unless it is incorporated into a careful analysis and explanation.  Ctr. for Biological

Diversity, 349 F.3d at 1169; Stop H-3 Ass'n, 740 F.2d at 1463-64; cf. Warm Springs, 621 F.2d at

1026 (holding that the agency cured the deficiency after litigation began by conducting additional

studies of the potential effect of the fault on the dam).

      ONRC also argues that the Forest Service has acted arbitrarily by not supplementing its

EAs to account for wildfires that have affected the timber sales since the EAs were prepared.

Here the new information presented to the agency is more discrete, involving two wildfires that

burned in or near the Clark and Pryor sales.  The Forest Service has explained that the effects of

wildfires throughout Oregon were considered in the 2005 Biological Opinion which covered

these two sales, and which concluded that the logging of sales considered would not jeopardize

the Northern Spotted Owl.  Review & Analysis at 10-11.  I find that this is an adequate

explanation of why these fires are not significant new information requiring supplemental

environmental analysis.

      Finally, in the Review & Analysis, the Forest Service determined that it would not

consider a number of items or categories of information which ONRC referenced in its court

filings but which the plaintiffs did not submit to the agency during the public comment period.

Review & Analysis at 2.  The Forest Service contended that ONRC forfeited its right to bring a

legal challenge by not submitting the issues to the agency during the public comment period on

the draft EAs and failing to exhaust administrative remedies. The agency also argued that

"because these parties opted to submit such information in the first instance to the Court, the

Forest Service believes that it is only appropriate that it make any substantive response that it may make to the information in the same venue, i.e., at an appropriate time in the litigation." Review & Analysis at 2.

In refusing to assess new information, at a time where the agency itself had requested a remand to consider new information and the projects were stayed, the Forest Service disregarded its duty under NEPA to be alert to information that might alter the result of the original analysis and to continue to take a hard look at the environmental effects of a planned action even after the logging was initially approved. Friends of the Clearwater, 222 F.3d at 557-58. Friends of the Clearwater specifically forecloses the Forest Service's claim that it should only respond to new information about environmental effects submitted in litigation in its own litigation filings. The Ninth Circuit found that the fact that "plaintiffs did not specifically identify this new information as the basis for their demands until after they sued the Forest Service did not excuse the Forest Service from earlier assessing the need for a SEIS." Id. at 558-59.

I emphasize that, in this case, NEPA does not obligate the Forest Service to assess contemporaneous information about the Northern Spotted Owl or other new information in a formal NEPA document because the agency has previously completed its EAs. The agency may assess the significance of new information regarding the owls in a less-formal document. However, there is much new information to consider, and the Review & Analysis does not adequately do so. All this information, and not only the examples cited above, must be analyzed in a careful and thorough manner to determine whether it rises to the level of significance warranting supplemental analysis in a formal NEPA document. This is not an order to reconsider the entire Northwest Forest Plan. See Review & Analysis at 18. Rather, it is a determination that the analysis of new information about the Northern Spotted Owl offered in the Review &

Page 28 - OPINION AND ORDER

Analysis did not include the degree of care or the analysis and explanation necessary for a decision not to supplement to be judged reasonable. Stop H-3 Ass'n, 740 F.2d at 1463-64.

It must be presumed that, after the Forest Service asked the court for the voluntary remand in August 2004, it was undertaking in good faith to analyze objectively the additional information available to it regarding these projects, regardless of whatever subjective institutional bias may be present within the agency. Metcalf, 214 F.3d at 1142. Any objective review would necessarily include the possibility that new information is significant, triggering the preparation of an EIS or possibly resulting in a decision to abandon the proposed action. Bob Marshall Alliance, 852 F.2d at 1228. Having asked for additional time to analyze the environmental effects of these six timber sales, and under a continuing duty to evaluate new information regarding the environmental effects of yet-to-be completed action, the Forest Service was wrong to claim in its April 2006 Review & Analysis that it should only respond to materials submitted in the 2004 court briefing through its own litigation filings. The agency had an obligation to consider this information during the administrative process. Friends of the Clearwater, 222 F.3d 552 at 555-58. On remand, the agency must evaluate the significance of any new information which it refused to consider in the course of preparing its Review & Analysis.

IV.    Forest Service's Obligation to Respond to Comments or to Prepare an EIS

In Count Four, ONRC argues that the Forest Service must respond to comments arising from the 2004 SEA process through a NEPA document. The Forest Service responds that this claim is effectively moot because the Review & Analysis addressed all of the comments.

Although the Forest Service is generally entitled to address new information, such as that provided in the comments to the draft SEAs, in less-formal documents, the agency must respond

Page 29 - OPINION AND ORDER

to any comments which were addressed to the inadequacy of the SEAs' alternatives analysis in the course of preparing its supplemental SEAs, or, if it chooses, in new EAs or EISs.  For comments that referenced new information related to environmental conditions on the six timber sales, the agency acted within its discretion to use the informal Review & Analysis as the means to address those comments.  Idaho Sporting Congress v. Alexander, 222 F.3d at 566.

ONRC also argues that the Forest Service is obligated to prepare an EIS because the environmental impacts from the six timber sales are significant.  An agency must prepare an EIS if substantial questions are raised as to whether a project may have a significant environmental effect.  Idaho Sporting Congress v. Thomas, 137 F.3d at 1149.  If it chooses not to prepare an EIS, an agency must supply a convincing statement of reasons why a project's impacts are insignificant.  Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998).

Although the Forest Service has not undertaken a sufficiently careful determination whether the new information bearing on the Northern Spotted Owl is significant in the context of the six timber sales, I find that ONRC has not carried its burden of showing that there are substantial questions whether this logging may have a significant environmental effect.  ONRC argues generally that the Forest Service has refused to consider whether its original findings of no significant impact remain valid more than eight years after it produced the EAs.  However, the plaintiffs do not specifically describe how any of the agency's particular determinations regarding impacts' significance are incorrect or inconsistent with the regulatory factors for judging "significance" in 40 C.F.R. § 1508.27.  Cf. Blue Mountains, 161 F.3d at 1212-16 (describing plaintiff's claims that Forest Service failed to evaluate the degree to which effects are likely to be highly controversial or are highly uncertain and provided in the regulatory definition

Page 30 - OPINION AND ORDER

of "significantly"); Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1192-94 (9th Cir. 1988) (describing evidence plaintiff presented from numerous experts showing the EA's inadequacies and casting serious doubt on the Forest Service's conclusions). In the circumstances of this case, ONRC's argument relates more to the sufficiency of supplementation than to inadequate significance determinations. I do not find that the Forest Service is required to prepare an EIS on remand, although the agency may find it needs to do so after it completes the necessary supplementation of the SEAs and analysis of new information.

V.    The Forest Service's Remaining Defenses

The Forest Service argues that the six year statute of limitations in 28 U.S.C. § 2401(a) bars the claims in the Third Amended Complaint, which ONRC filed on August 2, 2004. The agency claims that because the EAs which ONRC challenges in Count Two of the Third Amended Complaint were prepared more than six years before the filing of that amended complaint, the statute of limitations applies. However, the actions targeted in ONRC's claims in its Third Amended Complaint are the Forest Service's decisions to award the timber sales based on the original, inadequate EAs and then to proceed with the timber sales after preparing the SEAs. ONRC claims that these decisions were arbitrary and capricious because they were based on EAs and SEAs which, taken together, were flawed and inadequately supplemented and, as a result, violated NEPA. The Forest Service decisions to award five of the six timber sale contracts, the decisions to allow some logging of reduced areas to proceed on all six sales after the preparation of the SEAs in April 2004, and the alleged failure to supplement the EAs,[4] all

---

[4]Contrary to the Forest Service's suggestion in its briefing, ONRC's claim that the evidence in this case triggers the regulatory mandate that the agency "*shall* prepare supplements" based on significant new information, 40 C.F.R. § 1502.9(c)(1)(ii) (emphasis added), is precisely the sort of "*discrete* agency action that [the agency] is *required to take*" under the appropriate

Page 31 - OPINION AND ORDER

occurred within the six years prior to the filing of ONRC's Third Amended Complaint.

Accordingly, the six-year statute of limitations does not bar ONRC's claims.  See Portland

Audubon Soc'y v. Lujan, 795 F. Supp. 1489, 1502 n.1 (D. Or. 1992) (rejecting agency argument

that the statute of limitations barred challenge to administrative decisions made in earlier Timber

Management Plans when plaintiff instead challenged the agency's later decision not to prepare a

supplemental EIS).

   The Forest Service also argues that the doctrines of laches and equitable estoppel bar

ONRC's claims in its Third Amended Complaint.  To succeed on a laches defense, the Forest

Service must show that ONRC lacked diligence in pursuing its claims and that the agency was

thereby prejudiced.  Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372,

1381 (9th Cir. 1998).  This doctrine should be invoked sparingly and rarely in public interest

environmental litigation.  Id.; see also Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1241

(9th Cir. 1989) (rejecting BLM's laches defense).  The Forest Service has not made either

showing.  ONRC's claim in Count Two that the EAs and SEAs together are inadequate in light

of contemporary conditions, and its claim in Count Three that the Forest Service has improperly

failed to supplement the NEPA documents based on new information, were not available until

the new information upon which those claims are based became available.  Furthermore, the

Forest Service has not shown that it was in any way prejudiced by the timing of ONRC's filing of

its Third Amended Complaint.

---

factual circumstances, making the claim justiciable under APA § 706(1), 5 U.S.C. § 706(1).
SUWA, 542 U.S. at 64 (emphasis in original).  The Supreme Court's holding that the term
"action" in the APA "is meant to cover comprehensively every manner in which an agency may
exercise its power"defeats the Forest Service's argument that the supplementation of an EIS or
EA is not "agency action."  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001).

The Forest Service also argues that equitable estoppel should lie against ONRC for a statement made in an August 2003 brief that the issue addressed in the case was solely whether the survey and manage duties should have been disclosed in a NEPA analysis.  That pleading was based on the Amended Complaint in this case, and I have since given ONRC leave to file a Third Amended Complaint asserting other claims.  I find that ONRC's claims are not barred by laches or equitable estoppel.

VI.    Remedy

ONRC has requested that this action be dismissed with a permanent injunction in place if it should prevail, arguing that the "Forest Service has shown that it will use any further period of a stay or remand to attempt to strategically avoid complying with federal law."  Because the inadequacy of the Forest Service's SEAs and its assessment of the significance of new information stem in significant part from its misinterpretation of its obligations under NEPA, it is appropriate to remand to the agency for correction of those inadequacies.  Fed. Election Comm'n v. Akins, 524 U.S. 11, 25 (1998) (remand to agency is proper remedy if agency has misinterpreted the law); Metcalf, 214 F.3d at 1146.

On remand, the Forest Service must, at a minimum, prepare supplemental SEAs which consider a full range of alternatives, including a no action alternative for each sale, based on impacts to survey and manage species considered in conjunction with other environmental impacts the agency has identified on these sales.  In addition, the agency must provide a more careful, complete, and thorough explanation of why new information regarding the Northern Spotted Owl is, or is not, significant and whether it warrants additional supplementation of the EAs and SEAs or preparation of an EIS.  It must also evaluate the significance of other new information which it refused to consider in the Review & Analysis.  It is within the agency's

Page 33 - OPINION AND ORDER

discretion whether to prepare these explanations in the context of a formal NEPA document. Friends of the Clearwater, 222 F.3d at 559-60. In preparing whatever supplemental documents it chooses, the Forest Service must take care to objectively analyze the environmental effects of these sales and not put any financial interest it may have in harvesting timber before compliance with NEPA. Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1178 (9th Cir. 2006); Metcalf, 214 F.3d at 1142, 1146.

The nearly two-year delay between the Forest Service's request for a remand for further analysis and the issuance of an analysis which adopted overly-narrow views of the agency's NEPA obligations is troubling. Another two year delay in supplementing the environmental analysis or evaluating new information would put any new decision to proceed with these timber sales more than ten years beyond the date of the original EAs. The Forest Service has acknowledged that it is aware of the Council on Environmental Quality guidance that specifies "as a rule of thumb, if the proposal has not yet been implemented ... EISs that are more than 5 years old should be carefully reexamined to determine if the [significance] criteria in Section 1502.9 compel preparation of an EIS supplement." Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (1981); see Review & Analysis at 15. Although this remand is meant to give the Forest Service the opportunity to remedy the procedural flaws in its preparation of the 2004 SEAs and the Review & Analysis, the agency must also carefully reexamine whether the passage of time warrants preparation of new EAs or EISs for these six sales, and explain whatever decision it makes. S. Or. Citizens Against Toxic Sprays, Inc. v. Clark, 720 F.2d 1475, 1480 (9th Cir. 1983) (noting that the continuing duty to evaluate new information is especially relevant where the original environmental analysis was more than five years old); Blue

Page 34 - OPINION AND ORDER

Mountains Biodiversity Project v. United States Forest Serv., 229 F. Supp. 2d 1140, 1147-49 (D.

Or. 2002) (holding that the agency's decision not to supplement a fourteen-year old EIS was

arbitrary and capricious in light of the extent of the new information at issue).

**CONCLUSION**

For the foregoing reasons,  I grant in part ONRC's motion for summary judgment (# 283),

deny the Forest Service's motions for summary judgment (# 280) and to lift the stay and dissolve

the injunction (# 278), and deny Intervenor's motion regarding remedy issues (# 275).  The

decisions whether to proceed with the six timber sales are remanded to the Forest Service for

completion of the necessary NEPA analysis.  Except as modified by the parties' stipulated

motion,[5] the stay and injunction remain in effect and this court retains jurisdiction over this

action.

IT IS SO ORDERED.

Dated this _____9th_____ day of August, 2006.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge

---

[5] The parties submitted a stipulated motion to exempt the Forest Service's award, sale, and authorization of commercial thinning in approximately 230 acres of second growth in the Clark Timber Sale area from the current permanent injunction.  I granted that motion on July 31, 2006.

Page 35 - OPINION AND ORDER